Case No. 14-2870, Chicago Housing Authority v. Destefano and Partners My name is Rene Trabado Jr. and I am representing the Chicago Housing Authority. My name is John Massini representing the Eppley-Destefano and Partners Architects. I will provide the parties 15 minutes a piece. Rebuttal? Yes, there will be a rebuttal. How much time do we have for a rebuttal? Maybe two or three minutes, that's it. Okay, all right. Thank you. May it please the Court, Your Honor, I have the privilege of representing the Chicago Housing Authority in this matter, as I mentioned a moment ago. We are here appealing a decision dismissing pursuant to 2619, Count 1 of our third amended complaint, in a case brought by the CHA that was basically a breach of contract action. And the trial court saw apparently as a potential de facto indemnification type case. Let me ask you, we've had an opportunity to be familiar with the facts, so why is your case preempted? It's not preempted because it's a state law breach of contract case that is not derived from a violation of law. The simple fact here is there never was a violation of law. And let me explain that, what I mean, Your Honor. Before you get into that, let me ask you this. Has this issue ever been addressed by this Court or by our Supreme Court? I don't believe so, Your Honor. Is this a case of first impression? Yes, Your Honor. Okay. Yeah. But there is a Fourth District, Fourth Circuit case out there, Equal Rights Center. Equal Rights case. Do you think that was wrongfully decided? I'm not going to be up here arguing whether it was wrongfully decided or not. I just don't think that case applies to our situation. All right, well you show us how it doesn't apply. The key thing about the Equal Rights case is that you had a situation there where it was alleged or proven in a judicial proceeding that the defendant had violated the Americans with Disabilities Act. There was an actual proceeding. There was a finding. And ultimately the defendant decided to enter into a consent decree that required him to, or required it to pay, I believe it was a million dollars in fines. Was the owner ever actually found to have actually violated anything? Was there an actual finding of violation? It might as well have been, Judge, if you look at the, excuse me, Justice Lewis. It might as well have been, if you look at the consent decree that was signed by the defendant, Matter Archstone. But in that particular situation, there were fines, there were attorney's fees assessed against the defendant, and there were expenses that the defendant was required to incur that went out for many, many years. Here, in our particular situation, the CHA has never been found to have violated this law. Never found to have violated the regulations that implement the law. You get a little bit of what's going on in the CHA situation. There, the defendants here have maintained that the CHA has somehow violated Section 504 of the Rehabilitation Act. Section 504 of the Rehabilitation Act quite simply just says you can't discriminate against people with disabilities in programs that are funded by federal funds. That's really what it comes down to. In order to implement that statute, what happens is HUD sets certain quotas that have to be met, and they're quotas for providing accessible units for people with mobility impairments, namely wheelchair-bound folks or people having trouble moving around, and quotas for people with sensory impairments. Sensory impairments would be inability to see, can't hear. In our particular case, back when this project called the Plan for Transformation was initiated back in 2000, one of the things that was clear at that time was that the Department of Housing and Urban Development and the CHA had agreed that the quotas would be 5.3% for mobility-impaired people and 2.1% for people with sensory impairments, meaning that of the 25,000 units, basically, that were going to be rehabilitated, that were part of the public housing inventory, of the 25,000, 5.3% of those units had to be for people with mobility impairments. Can we go a little bit into the timeframe? So CHA and HUD say, right, these are the guidelines, these are the specifications, and as the project is moving along, then there's an amendment. Well, no, not necessarily so, Your Honor. What happened here was, as the project was going along, and five years into the 10-year Plan for Transformation, the Department of Housing and Urban Development goes in and conducts an inspection. I think it began in the early part of 2004, and it continued through the summer of 2004. And on September 30, 2004, the Department of Housing and Urban Development writes to CHA a letter, which was called a preliminary letter of findings, and it related to areas of noncompliance that the inspectors had found during their visits to the various housing units that had been completed to date. And subsequent to that, then, CHA and Stefano then amend the contract design. No, Your Honor, it was not. It wasn't subsequent to that? I'm sorry. You're right. They did amend the contract, and it was an amendment, it was a restatement, an amendment of the contract that was originally amended in June 2000. Now, in Equal Rights, there was an indemnification. Correct. And in your case, is that an indemnification? No, it's not an indemnification. Excuse me. Tell me why it's not an indemnification. The reason why it's not an indemnification is that it's not an indemnification that violates public policy. We're not seeking indemnification for a violation of law or anything that was even alleged. Nothing has been ever alleged against the CHA here that they had violated Section 504 or violated the regulations. It just didn't happen. That voluntary compliance agreement simply set a schedule of deadlines by which the CHA was going to have to deliver the particular units that would meet the quotas. The voluntary compliance agreement told the CHA to go out and get another architect and have that other architect go through and recertify those units that were accessible under the Uniform Federal Accessibility Standard and those units that were not. And if the units had to be redone, then the CHA was going to have to go out and get those units redone. But the point was, the CHA's compliance deadline here was the end of the plan for transformation. If they didn't have the 5.3% mobility impaired, excuse me, 5.3% units for mobility impaired persons or they didn't have the 2.1% for people with sensory impairments, at the end of that plan for transformation, yes, there would have been a violation of Section 504. And this case probably wouldn't have been here. But the simple fact of the matter was, following the voluntary compliance agreement, which the HUD District Director, Mr. McGough, commented on, and then after it had been filed in this case, he said it was not a settlement agreement. It was just nothing other than a plan to ensure that the CHA was going to meet its 504 obligations by the end of the plan for transformation. And that's what it is. And here, it's undisputed. You haven't seen anything in the record that disputes the fact that the CHA met its obligations prior to the deadline that was set in the voluntary compliance agreement. And for that reason, it's our position that we have not been alleged to be in violation of the law. We were not alleged to be in violation of the regulations. Everybody knew right from the beginning when they had the plan for transformation that work had to be done to bring the CHA's inventory of public housing units into compliance with Section 504. If you look at the plan for transformation document that was published and is... Excuse me a minute. The plan for transformation document that was part of the record, it's Volume 10, C-2403. There are numerous references throughout the other part of the document that describe the importance of having to meet Section 504 obligations. And that was one of the goals for this program. That was the reason why the CHA hired the defendants to come in and work on seven buildings. That was the reason why the CHA wanted people with experience. And that was the reason why the staff note was chosen because they had represented to the CHA that they had knowledge of all these different accessibility codes. And the simple fact of the matter is they did not. If you look at the way they acted in what happened in this particular case. But more to your point, Ron, this was not an action. The breach of contract action was not an action in which we're seeking indemnification for any proven violation of law or even alleged violation of law. It just didn't happen. Well, does Stefano ever charge with any wrongdoing or any noncompliance here as well? No, Your Honor. Okay. No, Your Honor. When you say charge, you mean that... The enforcement authority here is the Department of Housing and Urban Development. And then if it gets to a point where they want to go after somebody, then they turn you over to the Department of Justice. But no, not to my knowledge, does Stefano charge with any wrongdoing. Does that answer your question? One of the other key things that I think is important, and this is you see in the cases that have followed the equal rights decision, and that is that certainly the district courts in the Fourth Circuit have always looked to defining de facto indemnification cases as cases where the plaintiff's breach of contract action is basically a reiteration of indemnification claims that the court has already found were preempted by the anti-discrimination laws here. Again, I find those cases very instructive because they tell you what you have here. They speak in terms of indemnification for proven violations of law. And quite simply, as I said, they were not proven here and they were not even alleged here. And I think that's a key distinction between equal rights, Your Honor. There's one other thing that I just want to just give some reference to, and that is something that's more of a policy consideration. I'll just state it and sit down, Your Honor. The fact of the matter here is that I think distinguishes this case from just about every case that's been cited here in all the briefs that have been filed at all levels is the fact that this is a case where you're talking about taxpayer funds. If you look at the record here in the affidavit that we provided in connection with the motion for rehearing down below, it was clear that this whole plan for transformation, I'm sorry, all but 7% of the plan for transformation, was being funded by taxpayer dollars. Why is that important? Because I think what it does is it calls into question or implicates Article 6 of the, I guess it's the Anti-Discrimination Act of 1964. And Title 6 basically prohibited states from using federal funds to fund discriminatory activity. And that was a policy that was emphasized in pushing the Title 6 through Congress. It was a policy that was, I think, quite frankly, overlooked because that policy is implicated here. I mean, it seems somewhat, well, let me just say this. That policy is implicated here, and that type of policy would certainly support the type of actions that the CHA had brought here in terms of it being a breach of contract action and not a de facto indemnification action. And with that, I'll sit down. Thank you. Thank you. Good morning, Your Honors. Good morning. Again, John Messina on behalf of Appalachia De Stefano and Partners. Do you agree it's a case of first impression? I agree it's a case of first impression at the state level, Your Honor. And I would like to follow up on your point that there was a decision issued in the Southern District of Illinois, the Shanry case, which I believe is on point. In that case, the government sued numerous parties, including the owner, contractor, architect, and other parties for failure to design and construct in accordance with handicap accessibility guidelines. And the court in that case, in Shanry, specifically found that there was no right to indemnity or contribution under the FHA. And they specifically reviewed the congressional intent, which is really what's undermining all of these cases. And they found that Congress intended for each codefendant to have a non-indemnifiable and non-dedicable duty to comply with the FHA. What about the issue here that we really have two parties that were not cited for any wrongdoing or any noncompliance here? Your Honor, I think the timing issue is really a red herring. Counsel has raised the issue that, well, we were never actually found liable and we never found that they missed our quotas. The issue here is the non-dedicable duty. It's a non-dedicable duty that the CHA owes to the occupants of its buildings not to discriminate against them because of a handicap. And that non-dedicable duty existed before we even started this project, before the contract, before the VCA was signed, after the VCI. That's a non-dedicable duty that they owe. And based upon that non-dedicable duty, every single court that has addressed this issue has said you cannot seek indemnity if you have this non-dedicable duty. So the timing is completely irrelevant because if they ultimately have to pay, they can't recover the amounts that they pay to fix the alleged deficiencies. But they're arguing that they're not seeking indemnity. They are seeking indemnity, Your Honor. I mean, if you spend $4 million retrofitting your buildings to make them comply with handicap accessibility requirements and then you sue somebody to recover that $4 million, that's de facto indemnity. That was the same holding in Niles Bolton and several of the other cases that we've cited. What Counsel argued before us is he tried to show a narrow exception to that which was an equal rights center case. I'm sorry, the exception for taxpayers? Well, you know, showing that it wasn't an indemnity action, there was no violation of the ADA. I mean, can you address those things? Yes, in terms of it not being an indemnity claim, it's a de facto indemnity claim. And as I said, Niles Bolton, Mandalay, the other cases that we've cited, have held that in circumstances such as this where you expend, where the owner of the building expends money to rectify alleged handicap accessibility deficiencies and then they seek to recover that money from a third party, that is indemnity. That's de facto indemnity. The distinction that he tried to raise, I think, at the end about taxpayer funds, a couple of points on that. First of all, there is absolutely no case law whatsoever that indicates that if you use taxpayer funds, somehow it makes your non-delegable duty delegable. No, but it's a hell of an argument today. Well, I'll tell you what, though, Your Honor. There is a case directly on point, Independent Living Center of California versus City of Los Angeles, 2013 case, which they held consistent with every other case that you cannot seek indemnity or contribution for handicap accessibility violations. That involved taxpayer money because the City of Los Angeles ultimately had to pay for all those corrections. So there's case law precedent that refutes that argument as well. I'd like to address just a couple of other issues, Your Honor. Factually, though, with regards to independent living, wasn't that more of a pattern of discrimination? Here we just have a one-time allegation that there was some type of discrimination taking place with regards to this particular project. And independent living was more of an ongoing process, a pattern of discrimination. Does that make a difference here? It does not, Your Honor. I mean, all the cases talk about the fact that it's really two things. You have a non-delegable duty as an owner. And number two, if you incur costs to correct deficiencies in any federal handicap accessibility requirement, you cannot seek contribution or indemnity. We cited, Your Honor, I want to point this out, that we cited 17 cases in our briefs that involved these exact issues in terms of non-delegable duty, handicap accessibility requirements, violations of those requirements, seeking to recover the cost of those retrofits from third parties. Every single case that we cited is consistent. They cite to not a single case, not a single case, involving ADA, FHA, any type of federal handicap accessibility standard that was allegedly violated where the court found that you could pursue an indemnity or contribution claim. The only cases that they cited, and it's on the issue of presumption, are securities cases. And they cite to the securities law. And the other case that they cite relates to mortgage law and HAMP requirements. Completely irrelevant to the issues in this case. We have 17 cases, courts across the country, addressing this exact same issue, ruling the exact same way, which is how the trial court ruled. And in terms of this being a case of first impression, I would like to point out that there was a footnote that counsel cited about in a case of first impression, and they cite to the Supreme Court case of Cherry v. ACB. And they state that the courts, the reviewing courts at the trial court level, are to give great weight to the federal decisions. And they also state that one of the critical factors there is uniformity of the law. There could not be more uniform law on this issue. And they also state that there is a violation of handicap accessibility, non-delegable duty, and the inability to pursue indemnity or contribution claims. If this court were to, for some reason, reverse the trial court, it would be going directly against that well-established law. Let's see. The issue of the consent decree and the fact that they say that there were no violations, there are a number of cases that we cite, including Niles Bolton, Mandalay, a few more. And I want to agree with Your Honor that those did not involve judicial determinations. And in this case, similarly, a voluntary compliance agreement, those agreements are encouraged by HUD in their regulations because they want to resolve it up front instead of having to go to DOJ enforcement proceedings. That's the purpose. And in all those cases, there was no final determination, if you will. There was no judicial determination of a violation. And, again, the timing issue is irrelevant. When and if you are found liable or just the allegations of liability, the point is you have a non-delegable duty, and if you spend money to correct those deficiencies, you cannot seek indemnity or contribution. What's your best case? I think we have quite a few of them, Your Honor. Well, I know. You know, that's always an argument. Well, we've got an awful lot. I want to tell you something. I've been around for a long time. And I find no cases at this point at all. And with the exception of that Fourth Circuit Equal Rights Center, I mean, you could take all kinds of cases and say, you know, that have nothing to do with it and say that this is this and that's that. But when it comes down to it all, it looks like Equal Rights Center is about all that we really have. There's a case that says this and there's a case that says that. But what's your best case? Give me the best one you have. The best case that we have, I would say, is Niles Bolton because all the other cases then rely primarily on Niles Bolton. But we also have Rolf Jensen v. Mandalay. We have Miami Valley Fair Housing v. Steiner. We have U.S. v. Murphy. Well, you start going into all that, it takes away the credibility of it, you know, to argue all that. I just want to know your best case. I would say the best case is Niles Bolton because that's also the best case that all the other cases cite to and rely upon the most. All right. In the Niles Bolton case, do you really know what the agreement was between the parties there? I mean, did the court really address the issue about what was the agreement? Whereas here we know what the agreement was between DeStefano and CHA. There it seemed to be a little more murky in terms of what was really the agreement. I believe, per the agreement, it doesn't go into very much detail, but it does go into the detail that the architect, as in this case, was required to design in compliance with all applicable handicap accessibility requirements. Any other questions? No. Thank you very much. Thank you very much, Your Honors. Just a couple of minutes, Your Honor, please. With respect to the Shanry case that my opponent cited, the Seventh Circuit case, one of the points that we would make about the Shanry case is it really doesn't apply here because the issue involved in Shanry really dealt with whether or not there was an implied cause of action implied from this FHA for a private cause of action for contribution or indemnification. And in that particular matter, the court did not reach any preemption issue. They just said, in looking at the legislative history, that no, there was no private cause of action that was implied under the FHA for indemnification or contribution. Second, Your Honor, one of the things that I think cannot be overlooked is the delay case that we cited out of the Sixth Circuit. Now, the delay case stands for the proposition that if a person is not found to have been a wrongdoer, a violator of the law, the person can file an action and state a cause of action for getting indemnified for monies that it spent defending against the matter. And the Sixth Circuit basically said that that type of recovery would be consistent with the policy that doesn't allow indemnification for violations of law. That case, excuse me, is a federal securities law case. So how is it applicable to this case in terms of discrimination under ADA? The delay case is relied for its rationale on the Baker case out of the Fourth Circuit. The Baker case in the Fourth Circuit was a case that was cited repeatedly in the Equal Rights case. It was the same interpretation, and it basically took the tack from the Baker case that if there is no violation, you're entitled to get indemnification. Well, you know, if it's good for the delay case, it's certainly good for the decision you have in Equal Rights. If there is no violation, and I'm saying no alleged violation. I'm taking the position that there was no alleged violation here, or no actual violation in an administrative or judicial proceeding. It just didn't happen. And that's what distinguishes our case from every one of the 17 cases that my local council has referred you to. It just didn't happen. Many of the cases they decide address the issue of indemnification. Correct. And they say basically that's really what you're seeking for here is indemnification. Can you respond to that? We're not. We're not, because all we're seeking in our case is just the contract damages. Remember what happened in the Equal Rights case? The defendant owner did not go in and seek just his contract damages, and the Fourth Circuit made a point of saying in each instance he was trying to recover all of his damages. He was trying to recover for the million-dollar fine. He was trying to recover for the attorney's fees that he had to pay the other side. He was trying to recover for a number of things that don't fall under the heading of contract damages. The only thing that we're seeking in our breach of contract action is our contract damages. And we provided the court with an affidavit from one of the personnel at the CHA who made it clear that the only items that we're seeking damages for are the damages that arose as a result of The problem here was that the statute was so wrong on so many issues when it came to interpretation of UFAS that they had to move walls in order to go back and bring the units into compliance with the Uniform Federal Access Abilities Act. But you're trying to show that those damages were not indemnification. That's correct. It's our position that they were not. They were just basic contract damages that were permissible under Illinois law. That's the only thing we're seeking. Well, what it comes down to is what is the definition of indemnification and whether what you're asking for is indemnification. Well, I agree that that's what it comes down to, Judge. But let me also say this. In the context with which we're dealing, the public policy implications come into play if there has been a violation of law or not a violation of law. Excuse me, if there's been a violation of law or an alleged violation. I mean, let's look at equal rights itself. There was the violations of law that were agreed to in the consent decree. And then you have the defendant owner filing a cross-claim against the architect, Niles Bolton, saying, in essence, you know, under the Federalist Procedure, that Niles Bolton was liable for all of any damages we were required to pay out. That wasn't the case here. It was just no proceeding, nothing. I mean, if we take it to this extreme, Judge, and don't have a situation where you have at least allegations in a judicial proceeding or an administrative proceeding or a violation, how are you going to enforce a contract like we entered into where one of the obligations was to bring those buildings, excuse me, to incorporate into the units the Uniform Federal Accessibility Standards. That's what we're talking about here. And remember, the Uniform Federal Accessibility Standards are basically regulations that are used to implement the law. There was never any finding that the CHA did not meet its requirements under Section 504 of the Uniform Federal, excuse me, of the Rehab Act of 1973. Your Honor, thank you. Thank you very much. We want to thank counsels for a well-argued matter, professionalism. The court will take this matter under advisement, and we'll proceed to the next matter.